IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

COLUMBIA COMMUNITY BANK,
an Oregon corporation,

        Plaintiff,

   v.

PROGRESSIVE CASUALTY
INSURANCE COMPANY, an Ohio
corporation,

    Defendant.

Civ. No. 10-817-AA
OPINION AND ORDER

---

Ralph C. Spooner
Tyler E. Staggs
Spooner & Much, P.C.
530 Center Street N.E., Suite 722
Salem, OR 97301
      Attorneys for plaintiff

Kerry J. Shepherd
Paul Bierly
Maya Hamie Fitas
Markowitz, Herbold, Glade & Mehlhaf, P.C.
Suite 3000 Pacwest Center
1211 SW Fifth Avenue
Portland, OR 97204
      Attorneys for defendant

1    - OPINION AND ORDER

AIKEN, Chief Judge:

Plaintiff Columbia Community Bank (the Bank) filed suit against Progressive Casualty Insurance Company (Progressive), alleging breach of contract as a result Progressive's denial of coverage under a surety bond. This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Progressive now moves for summary judgment pursuant to Fed. R. Civ. P. 56 on the Bank's claim, arguing that, as a matter of law, the Bank does not meet the requirements for coverage under the bond. In turn, the Bank maintains that its losses are covered and also moves for summary judgment. The motions are denied.

## I. FACTUAL BACKGROUND

The Bank is in the business of personal and business banking. In 1999, it began a relationship with Morrell & Morrell, LLC (Morrell LLC) by extending credit in the form of numerous loans to finance real estate development. To secure the loans, Matthew Morrell, a principal of Morrell LLC, his wife, and his parents (the Senior Morrells) signed personal guaranties. Spooner Decl., Exs. 2, 3.

In 2003, Morell LLC changed from a limited liability company to a corporation and became Morrell & Morell, Inc. (Morrell Inc.). On July 26, 2004, Matthew Morrell submitted to the Bank updated guaranties from the Senior Morrells in order to support the continuing relationship between the Bank and Morrell Inc. Matthew Morrell Decl., Exs. A, B. In 2005 and 2007, Matthew Morrell also provided updated financial information regarding the Senior Morrells. Id. The Bank did not witness the Senior Morrells' signature on the 2004 guaranties and relied on Matthew Morrell to obtain the signatures and to provide updated financial information regarding the Senior Morrells. Between 1999 and 2004, the Senior Morrells stated assets totaled between approximately $1.8 and

$2.6 million. Because of their sizeable assets, the Senior Morrells played a key role in Morrell Inc.'s

ability to secure loans from the Bank, and the Bank relied heavily on the Senior Morrells' guaranties

and financial strength in extending credit to Morrell Inc. Johnson Decl., p. 2.

At the time of the 2004 guaranties, Morrell Inc.'s outstanding loans from the Bank totaled

over $750,000. Following the receipt of the 2004 guaranties and updated financial information for

the Senior Morrells, the Bank significantly increased the amount of financing provided to Morrell,

Inc. By 2008, the Bank had increased its loan exposure to Morrell Inc. to approximately $5,000,000.

On September 26, 2008, the Senior Morrells signed new personal guaranties at the Bank's

request. Hollander Decl., Ex. C, pp. 1-2, 4-5. Three days later, on September 29, 2008, the Senior

Morrells signed an "Addendum to Commercial Guaranty," providing that the new guaranties

"replaced and superceded all Guarantees signed by the Guarantor." Id., Ex. C, pp. 3, 6.

On November 15, 2008, for the first time in its relationship with the Bank, Morrell Inc. failed

to pay the amounts due under several of its loans. In accordance with the parties' agreements, all

of the indebtedness under all of the loans extended by the Bank became immediately due and

payable. Ultimately, Morrell Inc. defaulted on 17 out of 85 loans.

In the spring of 2009, the Bank discovered that the 2004-2007 documents from the Senior

Morrells, including the 2004 guaranties, tax returns, and updated financial information, were

fraudulent. It is undisputed that Matthew Morrell forged his parents' signatures on the 2004

guaranties and provided fraudulent financial and tax information with the intent to deceive the

Bank.[1]

---

[1]Matthew Morrell pled guilty to fraud charges relating to the underlying circumstances of
this case. Although the Bank objects to any evidence of Matthew Morrell's criminal conviction,
I find that his conviction has no bearing on the disposition of this motion.

The Bank filed suit against the Senior Morrells to enforce the 2008 guaranties, and the Hood River County Circuit Court granted summary judgment in favor of the Bank. First Shepherd Decl., Ex. H, pp. 2-4. The Senior Morrells appealed the judgment of the Circuit Court and ultimately entered into a settlement agreement with the Bank, whereby the Senior Morrells agreed to pay the Bank $250,000 in cash, and an additional $100,000 from the proceeds, if any, from malpractice claims against their former attorneys.

The Bank had purchased a Financial Institution Bond (the Bond) from Progressive. On February 17, 2010, the Bank sought coverage for the defaulted loans. When Progressive denied coverage, the Bank instituted this lawsuit against Progressive for breach of contract. The Bank seeks damages in the amount of its alleged loss of $2,248,155.25.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if materials in the record show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) & (c). The materiality of a fact is determined by the substantive law on the issue. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The authenticity of a dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply to evaluating summary judgment motions: (1) all

4    - OPINION AND ORDER

reasonable doubts as to the existence of genuine issues of material fact should be resolved against

the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the

light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 630.

### III. DISCUSSION

The Bank and Progressive each move for summary judgment on the Bank's claim for breach

of contract and offer competing interpretations of the Bond language.  Progressive maintains that

coverage for the Bank's loss is precluded by the Bond language, while the Bank maintains that its

loss is covered due to its reliance on the forged guarantees when it extended credit to Morrell Inc.

The Bond provides coverage, in pertinent part, for the following:

> Loss resulting directly from the Insured having, in good faith, for its own account or
> for the account of others. . . extended credit . . . on the faith of, any Written, Original
> . . .Corporate . . . or personal Guarantee . . . which bears a handwritten signature of
> any . . . guarantor. . . which is a Forgery. . . .

Spooner Decl., Ex. 6, p. 3 (Financial Institution Bond, § E(1)(g)(I)).

The parties agree that the Bank suffered a loss, that Matthew Morrell forged the Senior

Morrells' 2004 guaranties with the intent to deceive the Bank, and that the Bank relied on those

guaranties in extending additional credit to Morrell, Inc.  However, the parties dispute whether the

Bank's loss "resulted directly" from the Bank's reliance on the forged 2004 guaranties in extending

credit to Morrell, Inc.

The Bank asserts that loss "resulting directly from" means "proximately caused by" a forgery.

As such, the Bank argues that the Bond provides coverage because the forged 2004 guaranties were

a proximate cause of the Bank's loss, in that the Bank extended credit to Morrell, Inc. in reliance on

the Senior Morrells' forged 2004 guaranties.  See Jefferson Bank v. Progressive Cas. Ins. Co., 965

F.2d 1274, 1282 (3rd Cir. 1992) ("Given the difficulty and confusion that results from applying a 'nearest cause' or 'immediate cause' standard, we do not believe that the parties intended to contract for it."); see also Bidwell & Co., v. Nat'l Union Fire Ins. Co., 2001 WL 204843, at *9 (D. Or. Jan. 18, 2001) ("Generally, the bond's requirement that a loss 'result directly from' an event, requires a standard of proximate causation.") (citing cases).

Progressive disagrees with the Bank's interpretation and argues that the Bond provides coverage only when the loss results "directly," "solely," and "immediately" from a forgery. Progressive thus argues that the Bond does not cover the Bank's loss, because multiple factors - including forged and inflated financial statements of the Senior Morrells, the crash of the real estate market, and the Bank's failure to conduct due diligence and follow standard procedures in obtaining signatures - contributed to the Bank's loss. Further, Progressive argues that the Bank's loss would have occurred even if the 2004 guaranty signatures had been genuine, because the Senior Morrells had insufficient assets to secure the loans to Morrell, Inc. upon its default as evidenced by their settlement agreement with the Bank. See Flagstar Bank v. Fed. Ins. Co., 260 Fed. Appx. 820, 2008 WL 162946 (6th Cir. Jan. 16, 2008); see also Liberty Nat'l Bank v. Aetna Life & Cas. Co., 568 F. Supp. 860 (D. N.J. 1983).

I am not persuaded that a "proximate cause" standard proposed by the Bank should be adopted in cases involving the interpretation of contract language. See Beach Cmty. Bank v. St. Paul Mercury Ins. Co., 635 F.3d 1190, 1195 (11th Cir. 2011) (application of tort concepts of causation to bond language, including proximate cause, is erroneous). Rather, under well-established Oregon law, I look to the plain meaning of the Bond language. Dewsnup v. Farmers Ins. Co. of Oregon, 349 Or. 33, 40, 239 P.3d 493 (2010).

6      - OPINION AND ORDER

I find that the plain meaning of the phrase "resulting directly from" means that the loss suffered must be a direct consequence of extending credit in reliance on a forgery. However, contrary to Progressive's assertion, the Bond language does not include the term "solely" and the context of the language does not suggest that reliance on a forgery must be the sole or only factor contributing to the loss. I thus disagree with Progressive's interpretation of the Bond and with the reasoning of the cases it cites in support.

In Flagstar Bank, a mortgage broker created fraudulent mortgage documents and forged signatures on supporting promissory notes to obtain a $20 million line of credit from Flagstar. 260 Fed. Appx. at 821. However, the underlying mortgage transactions were "completely fictional" and the promissory notes worthless. Flagstar sought to recover the loss from its insurer, as a "loss resulting directly" from "forgery or fraudulent material alteration" of a negotiable instrument. Id. The insurer denied the claim on the grounds that Flagstar's loss did not result directly from the forgeries, but rather from the worthless collateral. Id. The district court found for the insurer, and on appeal, the Sixth Circuit affirmed, holding that "the clauses of financial institution bonds, which cover loss resulting either directly or indirectly from forgery, do not cover loss arising from the extension of loans based on fictitious collateral." Id. at 823; see also F.D.I.C. v. Firemen's Ins. Co., 109 F.3d 1084, 1088 (5th Cir. 1997); (fraudulently-obtained signature "had no effect on the value of the assignments or the underlying mortgages" and did not cause the defect in mortgage or instrument); KW Bancshares, Inc. v. Syndicates of Underwriters at Lloyd's, 965 F. Supp. 1047, 1054 (W.D. Tenn. 1997) (bank's loss did not result directly from forgery when loans were based on fraudulent letter falsely stating that the individual would receive a bonus from his employer); French Am. Banking Corp. v. Flota Mercante Grancolombiana, S.A., 752 F. Supp. 83, 91 (S.D.N.Y. 1990)

7    - OPINION AND ORDER

(bank's loss resulted from fraudulent scheme rather than purported forgery when it made loans to a company on the basis of "non-existent or previously completed transactions"); Liberty Nat'l Bank, 568 F. Supp. at 863 ("[E]ven if counterfeit and forged, the loss sustained by the Bank was not caused by the lack of authenticity or genuineness of the documents. On the contrary, the loss was caused by the fact that the statements contained in the document were not true. The assets represented thereby did not exist.").[2]

Importantly, Flagstar Bank and the other cases cited by Progressive involved fictitious or worthless collateral that was deemed to be the cause of the alleged loss. Here, Progressive attempts to paint the Senior Morrells' 2004 guaranties as similarly supported by worthless security, citing the settlement between the Senior Morrells and the Bank to assert that it is "undisputed" that the Senior Morrells had insufficient assets to satisfy the loans. However, regardless of any settlement the Bank subsequently obtained with the Senior Morrells, the Bank submits evidence that the Senior Morrells possessed significant assets at the time of the 2004 guaranties.  Gerald Morrell Decl., pp. 1-2; Johnson Decl., p. 2.  Thus, the loans to Morrell, Inc. were not based on fictitious or fraudulent collateral and the facts of this case are distinguishable from Flagstar Bank.

---

[2]Progressive also cites a Ninth Circuit case for its argument that the forgery must be the sole and only cause of the alleged loss. See Vons Companies, Inc. v. Fed. Ins. Co., 212 F.3d 489 (9th Cir. 2000). However, the facts of that case are vastly different. There, the plaintiff attempted to obtain coverage for a $10 million settlement reached as a result of claims brought against it based on the fraudulent conduct of an employee/agent. Id. at 490-91. The Ninth Circuit affirmed the denial of coverage, holding that the relevant "policy did not provide coverage for third party claims" and did not "provide indemnity for vicarious liability for tortious acts of its employee." Id. at 492-93. Such reasoning is inapplicable to the facts of this case.

Likewise, the cited cases of First Ins. Funding Corp. v. Fed. Ins. Co., 284 F.3d 799 (7th Cir. 2002) and Empire Bank v. Fidelity & Deposit Co., 27 F.3d 333, (8th Cir. 1994) involved indemnification and coverage for loss resulting from the fraudulent actions of employees or agents, issues not raised in this case.

Moreover, Progressive's argument fails to recognize or address the Bank's position that it never would have extended credit to Morrell, Inc. without valid guaranties from the Senior Morrells. Progressive's insistence that the forgery did not "directly result" in the Bank's loss - because the Senior Morrells' security or collateral was insufficient even if the forged guaranties had been genuine - ignores the assertion that the Bank would not have exposed itself to the loss absent the forged guaranties. See First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co., 485 F.3d 971, 980 (7th Cir. 2007) ("This conclusion ignores the practical reality of the situation; but for the forged documents purporting to verify the existence of the collateral, credit would not have been extended in the first place, and there would have been no loss.").

Ultimately, I am persuaded by and adopt the reasoning of the Eleventh Circuit's recent decision in Beach Community Bank. There, the district court denied coverage under a similar bond for losses sustained after the plaintiff bank extended credit in reliance on a personal guaranty, later determined to be a forgery. 635 F.3d at 1192-93. Although valuable collateral existed at the time of the forgery, when the bank sought to collect the debt under the guaranty, the value of the assets were insufficient to cover the debt. Id. at 1193. After the bank filed suit seeking coverage for the loss, the district court found in favor of the insurer on grounds that the bank "failed to demonstrate that its loss result[ed] directly from the forged guarantee," in that "it was not the forged guarantee that precluded [the bank] from collecting on the loan, but rather [the guarantors] diminished assets and the crashed real estate market that caused [the bank's] loss." Beach Cmty. Bank, 635 F.3d at 1194 (quoting district court ruling).

In reversing the decision of the district court, the Eleventh Circuit noted that state law contract principles governed and looked to the meaning of the bond language. Id. at 1195. The

Eleventh Circuit found persuasive the bank's argument that its loss resulted directly from its extension of credit in reliance on the forgery, because the forged personal guaranty caused the bank to "extend credit where it otherwise would not have, and the guaranty would have had value if it had been authentic." Id. (quotation marks omitted). Accordingly,"[t]he measure of the loss Beach Community suffered is based on the amount of credit extended, not the amount that could be recovered in a hypothetical collection effort," and thus the "decline in [the guarantor's] wealth had nothing to do with the extension of credit . . . and should not affect the coverage of the loss." Id. at 1195. The court specifically distinguished Flagstar Bank and other cases that denied coverage when the forgery "either described non-existent collateral or misrepresented the value of the collateral." Id. at 1196. Even though the guarantor in Beach Community Bank had few assets, the court emphasized that a legitimate guaranty "would have had value because it would have imposed a legal obligation on [the guarantor]. Beach Community could have obtained a judgment against [her] and attached any non-exempt income or assets." Id. at 1197.

I find the analysis in Beach Community Bank particularly relevant to this case. Similar to the facts in that case, the Bank extended credit in reliance on forged guaranties, and the Bank contends it would not have extended credit to Morrell, Inc. without the 2004 forged guaranties from the Senior Morrells. Although Matthew Morrell may have provided the Bank with fraudulent tax and financial information, at the time of the 2004 forgeries the Senior Morrells had sizeable assets and a valid guaranty "would have had value" and "imposed a legal obligation" on the Senior Morrells. While other contributing factors may have affected the amount the Bank ultimately could recover from the Senior Morrells, those factors and the subsequent inability of the Senior Morrells to satisfy the debt do not render the loss "indirect" so as to preclude coverage under the Bond. See

10    - OPINION AND ORDER

Beach Cmty. Bank, 635 F.3d at 1195.  That said, questions of fact remain.

First, the Bank does not present conclusive evidence that establishes the extent of the Bank's reliance on the Senior Morrells' 2004 guaranties.  The Bank's Executive Vice President asserts that "the Bank made clear to all parties that the loans would not go forward without the Senior Morrells' Guaranties."  Johnson Decl., p. 2.  However, it is unclear whether he refers to the 1999 or 2004 Guaranties and which loans the Bank would have withheld absent the 2004 guaranties.

Second, the existence of the Senior Morrells' 2008 guaranties raises a question of fact as to their effect on the 2004 guaranties.  Progressive argues that the Bank's loss could not have resulted directly from its reliance on the 2004 guaranties, because the Bank subsequently obtained superceding guaranties from the Senior Morrells in 2008.  Given that the 2008 guaranties purported to guaranty all loans extended to Morrell Inc., Progressive maintains that the Bank's loss resulted directly from the Senior Morrells' inability to honor their 2008 guaranties.  The Bank maintains that the 2008 guaranties should be viewed as subsequent mitigation efforts that, under the analysis of Beach Community Bank, do not preclude coverage under the Bond.  Beach Cmty. Bank, 635 F.3d at 1196 (coverage under bond is "unaffected by acts that follow the fraudulent act").  While the 2008 guaranties purport to "replace[] and supercede[] all Guarantees signed by" the Senior Morrells, it remains unclear whether the Senior Morrells had knowledge of the forged guaranties and whether they intended to assume responsibility for the 2004 guaranties.   Hollander Decl., Ex. C, pp. 3, 6.  At the same time, the Bank does not present conclusive evidence to support its assertion that the 2008 guaranties were after-the-fact mitigation efforts.  Determining the intent of the Bank in requesting the 2008 guaranties and of the Senior Morrells in signing the 2008 guaranties remains, at minimum, a question of fact.

11     - OPINION AND ORDER

In sum, while the Bond provides coverage for loss resulting from the Bank's extension of credit to Morrell Inc. in reliance on the forged 2004 guaranties, genuine issues of material fact exist as to the extent of the Bank's reliance and the effect of the 2008 guaranties.

## CONCLUSION

For the reasons explained above, Progressive's Motion for Summary Judgment (doc. 22) and the Bank's Motion for Summary Judgment (doc. 27) are DENIED.

IT IS SO ORDERED.

Dated this _15th_ day of June, 2011.

Ann Aiken
United States District Judge